# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

JOINT PURCHASING CORPORATION and CREATIVE SOURCE CONCEPTS, INC.,

Plaintiffs,

-against-

AMERINET, INC.; AMERINET GROUP PURCHASING LLC; VECTOR HEALTHSYSTEMS, INC.; and GENERAL ELECTRIC COMPANY,

Defendants.

---------------------------------------------------------------x

Case No. 07-CV-2298(JGK)(KNF)

AFFIDAVIT IN OPPOSITION TO MOTION TO DISMISS OR TRANSFER VENUE

STATE OF ILLINOIS
COUNTY OF LAKE

CHRISTOPHER MOORE, being duly sworn, deposes and says:

1. I am the President of Joint Purchasing Corporation ("JPC"), one of the plaintiffs in the above-captioned action. Plaintiff Creative Source Concepts, Inc. ("CSC") is a wholly-owned subsidiary of JPC. I submit this affidavit in opposition to the motion by Amerinet, Inc. and Amerinet LLC (collectively "Amerinet") dismissing plaintiffs' First Amended Complaint, or, in the alternative, transferring this case to the District of Rhode Island. I became President of JPC and CSC in May of 2004, and have personal knowledge of the facts set forth in this affidavit and would testify competently to them if called as a witness at trial. The basis for my understanding with respect to those events that antedate my involvement with plaintiffs is examination of the books and records of the plaintiffs and discussions with current and former employees of plaintiffs.

2. JPC was founded in 1975 under the Not For Profit Law of the State of

New York, and traces its operations to a corporation formed in 1922. CSC is a New Jersey corporation that was founded in 1983. At all times relevant to this action, JPC and CSC were engaged in the group purchasing business. In brief, plaintiffs negotiated contracts for goods and services with suppliers in the health care field ("Supplier Contracts"); because of plaintiffs' status as group purchasing organizations, the suppliers gave plaintiffs substantial discounts on the assumption that plaintiffs would be responsible for generating large volumes of purchases. Health care facilities, such as hospitals and nursing homes, entered into contracts with plaintiffs (the "Participant Contracts") in order to participate in plaintiffs' Supplier Contracts, and would thereby be able to purchase supplies at the discounts negotiated by plaintiffs. As consideration for plaintiffs' efforts, the suppliers paid plaintiffs contract administration fees based on the amounts purchased by the participants.

3. At the time of the negotiation of the Asset Purchase Agreement, JPC was also engaged in two other important lines of business. First, JPC was a member of Mid-Atlantic Group Network of Shared Services, Inc., a New York not-for-profit corporation ("Magnet"). Magnet negotiated and maintained its own contracts with health care products suppliers, and by virtue of JPC's membership in Magnet, the JPC participant health care facilities could also participate in Magnet contracts with Magnet suppliers in the same manner as they were able to participate in contracts between plaintiffs and their suppliers. JPC received approximately $1 million per year as a result of its relationship with Magnet. Second, JPC was actively promoting a business organization concept in which health care providers would join together and form a limited liability company for group purchasing purposes; this limited liability company would, in effect, become a mini-group purchasing organization and negotiate directly with suppliers for

lower prices on products and services that would be available to members of the limited liability companies acting alone. JPC was also acting as the managing member of three of these limited liability companies (the "LLCs"), and viewed the market as open to the development of many more. JPC received revenue for its membership in and management services on behalf of the LLCs.

4. In 2003, JPC decided, for a variety of reasons, to alter its business plan in certain respects and focus to a greater extent on its educational mission. In that regard, after exploration of various options, it entered into negotiations with defendant Vector Healthsystems, Inc. ("Vector"), another group purchasing organization, which culminated in a series of agreements that are at issue in this action. Plaintiffs and Vector entered into an Asset Purchase Agreement dated March 11, 2004, in which plaintiffs agreed to transfer to Vector their existing Supplier Contracts and Participant Contracts for a lump-sum payment. The parties contemplated that Vector would obtain approval for assignments of the Supplier Contracts before their expiration where such approval was required, and would continue to perform these contracts as a direct contracting party in Vector's own name, not in the name of plaintiffs. In order to provide seamless service to plaintiffs' participants until the Supplier Contracts could be formally assigned to Vector, JPC entered into a Management Services Agreement with Vector, also dated March 11, 2004, in which JPC engaged Vector to service JPC's obligations under the Supplier Contracts until Vector could obtain formal assignment. The Management Services Agreement also provided that Vector would perform JPC's management obligations under the terms of each of the LLC operating agreements and the Magnet governing documents. In exchange, Vector agreed to pay JPC 5% of the amounts received by Vector as a result of the Magnet and LLC

activities. Vector also undertook the administrative duties of JPC, and management duties to negotiate contracts on behalf of the limited liability companies, report to JPC and monitor fees paid by vendors, develop annual business plans, provide audit rights to JPC, and perform or satisfy all duties and obligations of JPC under the LLC and Magnet governing documents. However, JPC continued its corporate existence and not-for-profit status, retained its name, and maintained its status as managing member of the LLCs and a member of Magnet, from which it expected to receive significant revenues through the Vector Management Services Agreement. In 2006, a non-compete provision of the Asset Purchase Agreement was to expire and JPC was evaluating its options in relation to the group purchasing business and educational mission. At the time of the expiration of the JPC non-compete in 2006, Amerinet purchased Vector (or its assets) and Vector assigned all of the transaction agreements to Amerinet.

5. In late 2006, I became aware that Vector or Amerinet, as successor to Vector, had entered into new contracts with vendors under the "JPC" name and had modified some of the contracts transferred in the Asset Purchase Agreement, again in the name of JPC instead of Amerinet. I vigorously complained to Amerinet, but Amerinet took the incredible position that JPC had sold its name to Vector in the Asset Purchase Agreement, and that it could enter into contracts in the name of JPC while concealing from such contracting parties that JPC in fact had no involvement. At the same time that I was discussing this issue with Amerinet, JPC received certain funds transfers from defendant General Electric Company ("GE"), doing business as GE Healthcare and GE Medical Systems. My review of the JPC web site (which was then being operated by Amerinet) indicated that the contracts for which JPC received the funds from GE might not have been among the contracts that JPC transferred to Vector. Plaintiffs

previously transferred all sums received from the suppliers to Amerinet on the assumption that such payments were related to the contracts the plaintiff transferred to Vector in the asset transfer transaction. I was concerned that GE might make an adverse claim to these funds if it learned that JPC did not in fact authorize the amendments to the contracts, and accordingly placed these funds in escrow with our attorneys in New York City; these funds are the subject of the interpleader cause of action in plaintiffs' First Amended Complaint. My fears were heightened when I discovered that Amerinet had entered into other contracts in JPC's name with other companies with which JPC had no prior relationship.

6. Our efforts to resolve the dispute with Amerinet were not successful, and Amerinet commenced arbitration before the American Arbitration Association under the arbitration provisions of the Management Services Agreement to recover the funds transferred by GE to JPC. The plaintiffs participated in the arbitration proceedings and asserted counterclaims under the Management Services Agreement. However, the Asset Purchase Agreement did not contain an arbitration provision and in our view, the issue of whether or not the plaintiffs' names were sold to Vector was not subject to arbitration. Accordingly, on February 26, 2007, JPC filed a declaratory judgment action against Amerinet, Inc. and Amerinet, LLC in the Supreme Court of the State of New York, County of New York, seeking a declaration that the plaintiffs had not sold their names to Vector and an injunction barring the defendants from using the plaintiffs' names. The relief sought in the New York state court action was broader than the relief sought by Amerinet in the arbitration, and a decision in the New York state court action could have resolved the issues in the arbitration; therefore the parties agreed to discontinue the arbitration proceedings in favor of a judicial resolution. However, instead of responding to the plaintiffs'

New York state court complaint, Amerinet, Inc. filed an action in the United States District Court for the District of Rhode Island, seeking recovery of the GE funds and a declaration that the plaintiffs had sold Vector their names in the Asset Purchase Agreement (the same issue that was already before the New York state court). After removing the New York state court action to this Court, Amerinet now seeks to transfer this case to Rhode Island.

7. A complete statement of the procedural history of this dispute and description of the parties' respective claims is contained in the accompanying affirmation of Arthur R. Lehman, and I will not repeat it in this affidavit. This affidavit will be limited to certain of the issues raised on Amerinet's motion. In particular, this affidavit will demonstrate that plaintiffs' choice of forum should be respected and this first-filed action should not be transferred to the District of Rhode Island.

8. I will now address the claim that venue is not proper in the Southern District of New York. In 2004, at the time of the Asset Purchase Agreement, plaintiffs had certain existing contracts with defendant GE that were transferred to Vector. For example, I enclose as Exhibit A a copy of the first pages of two Strategic Alliance Agreements between plaintiffs and GE Medical Systems that were among the contracts transferred to Vector. The agreements identify the contracting party as "General Electric Company, by and through its division GE Medical Systems ('GE')."

9. Plaintiffs entered into certain other contracts with a company known in 2003 as Amersham Health and a company known as Medi-Physics, Inc., which I understand were purchased by GE. Amerinet suggests that plaintiffs are mistaken in their identification of GE as the contracting party on those contracts. See, moving affidavit of John Bolton sworn to

April 6, 2006, at p.2. fn.2. Although Mr. Bolton suggests that the proper party is company named GE Healthcare, Inc., I have no knowledge or familiarity with such an entity. To my knowledge, none of the contracts transferred by plaintiffs in the Asset Purchase Agreement were between plaintiffs and GE Healthcare, Inc., and the funds received from GE that are the subject of this action do not refer to GE Healthcare, Inc. I attach as Exhibit B copies of remittance advices received in connection with the GE wire transfers, all of which indicate that the funds were paid by GE Trade Payables on behalf of "GE Medical Systems" or "GE Healthcare Parent."

10. I attach as Exhibit C copies of two contracts (without the schedules) that Amerinets' counsel provided to plaintiffs' counsel; these contracts purportedly are the contracts that relate to the GE funds that are subject of the interpleader claims. The amended contracts were entered into in December 2004, or nine months after the closing of the Asset Purchase Agreement. The contracts are signed by "Vector Healthsystems For JPC/CSC." Thus, it is now clear that Vector did not accurately inform GE of its status in the transaction and enter into these new contracts in Vector's own name; instead, Vector pretended that it had authority to enter into these contracts on behalf of, or as agent for, JPC and CSC. These contracts by their terms purport to "restate and amend" the arrangements that formerly existed between JPC, CSC, and GE. Plaintiffs did not know about or approve these amendments. As was the case with the other GE contracts, the name "GE Healthcare, Inc." does not appear anywhere in these contracts. Thus, I believe that GE is correctly named as a defendant in this action.

11. I chose New York as the forum for this action because JPC is a New York corporation and for the convenience of plaintiffs' witnesses, the ease of access to plaintiffs' documents, and the availability of process to compel third-party witnesses to attend trial, if

necessary. Plaintiffs were not under any threat of broad litigation by Amerinet at the time that we commenced the New York state court action. To the contrary, Amerinet had determined to arbitrate its claim, and limited its claim in arbitration to the GE funds. Thus, under no circumstances could our filing of the New York state court action be considered a race to the courthouse or anticipatory forum shopping.

12. JPC continues to conduct business in New York, and maintains offices at 11 Penn Plaza in New York City. To the extent that records relevant to this dispute are not located in my office, they are located in our storage facility on Long Island. None of the plaintiffs maintains any offices or employees in Rhode Island. One of the principal claims against Amerinet arises out of the sales practices of Amerinet's representatives. Amerinet was obligated under the Management Services Contract to promote the Magnet contracts on behalf of JPC. However, I have been informed by Magnet and former Magnet contract participants that the Amerinet sales force promoted Amerinet contracts over Magnet contracts and falsely stated that JPC had completely gone out of business, thereby discouraging JPC participants from using Magnet contracts, for which JPC would have received compensation. These statements also undercut plaintiffs' credibility in the market, and will make it very difficult for us to re-enter the group purchasing market, as we are permitted to do under the Asset Purchase Agreement. Many of plaintiffs' most substantial participants are located in the New York City area, and I expect that these participants will be interviewed and those who were told that JPC was no longer in business will be deposed and compelled by subpoena to attend trial. Finally, JPC is a New York not-for-profit corporation, and the State of New York and its residents have an obvious interest in the outcome of this dispute.

13. I have identified several witnesses for plaintiff whose testimony will be important and who live the New York City area. Among these are several current and former JPC and CSC employees.

a. Ed Cienki was a long-time JPC employee who is familiar with the asset transfer transaction and the contracts of plaintiffs that were transferred. At the time of the Asset Purchase Agreement, Mr. Cienki was president of plaintiff CSC, and he executed the Asset Purchase Agreement on behalf of CSC. Mr. Cienki is currently an attorney in private practice and lives in Hammonton, New Jersey, which is less than 100 miles from New York City (according to Mapquest).

b. Ethan Gelman is a former JPC employee who now works for Amerinet in Amerinet's New York City office. Mr. Gelman worked with JPC on managing the contracts for the LLCs and is generally knowledgeable about the transition of the transferred assets from plaintiffs to Vector and defendants' performance of their agreements with plaintiffs. He lives in Brooklyn, New York.

c. Jackie Adorno was involved in customer service and contract analysis at JPC and now also works in Amerinet's New York City office. She is knowledgeable about the transition of the transferred assets from plaintiffs to Vector and defendants' performance of their agreements with plaintiffs. She lives in Bronx, New York.

d. Robert Polevetz was involved in customer service and contract analysis at JPC and also works for and in Amerinet's New York City office. He has knowledge about the transition and transferred assets from plaintiffs to Vector and defendant's performance of their agreements with plaintiffs. He lives in New Jersey and works in New York City.

e. Dominick Bencivenga is JPC's interim controller. Mr. Bencivenga coordinated all of the reporting and contract administration fee allocations with Vector on the LLCs, Magnet, and the transferred contracts, and is generally familiar with the financial results of the Magnet and LLC activities of JPC. He lives in Huntington, New York.

f. Kalpathi S. Mohan was JPC's controller at the time of the asset transfer. Mr. Mohan coordinated the due diligence for the asset transfer and is familiar with the contracts transferred to Vector. Mr. Mohan lives in New Jersey and works in New York City.

g. Lee Mermelstein was plaintiffs' counsel in connection with the drafting, negotiation, and execution of the Asset Purchase Agreement and ancillary transaction documents. He will be a key witness with respect to whether or not the parties intended that the names of the plaintiffs be transferred to Vector. He lives in Armonk, New York, and his office is in New York City.

14. JPC is a small, not-for-profit company with very little income. The plaintiffs transferred most of their money-making assets to Vector with the expectation that Vector would live up to its contractual obligations and promote the Magnet contracts and limited liability company concepts for the benefit of plaintiffs. Instead, as a result of the defendants' breaches, plaintiffs receive insignificant revenues and can ill-afford to pursue litigation in a distant court. On the other hand, Amerinet is one of the largest group purchasing organizations in the country, and its headquarters are in Missouri. Amerinet will not suffer any additional cost or inconvenience if its Missouri witnesses participate in litigation in New York instead of Rhode Island.

I therefore respectfully request that Amerinet's motion be denied in all respects.

CHRISTOPHER MOORE

Sworn to before me this
18th day of April, 2007

Notary Public

OFFICIAL SEAL
BLANCA ALVAREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-9-2008

EXHIBIT A

# STRATEGIC ALLIANCE AGREEMENT

## Joint Purchasing Corporation

## and

## g

## GE Medical Systems

This Strategic Alliance Agreement ("Agreement") is between Joint Purchasing Corporation ("Customer") and General Electric Company, by and through its division GE Medical Systems ("GE"). This Agreement shall have a 60 month term.

**EFFECTIVE DATE:** January 1, 2002

| **Between** | **And** |
|---|---|
| **General Electric Company**<br>**3000 N. Grandview Blvd.**<br>**Waukesha, WI 53188** | **Joint Purchasing Corporation** |
| **By:** William H. Jaeck | **By:** A G Janover |
| **Name:** William H. Jaeck | **Name:** Andrew G. Janover |
| **Title:** Marketing Manager, Corporate Accounts | **Title:** Sr. VP of Operations |
| **Date:** 1/15/02 | **Date:** January 11, 2002 |
| **Telephone Number:** 262-548-2405 | **Telephone Number:** 212-757-7575 |

# STRATEGIC ALLIANCE AGREEMENT

## Joint Purchasing Corporation /Creative Source Concepts, Inc.

## and

***GE Medical Systems***
*OEC*

This Strategic Alliance Agreement ("Agreement") is between Joint Purchasing Corporation ("JPC"), on behalf of itself and its wholly owned subsidiary Creative Source Concepts, Inc., ("CSC") (collectively, the "Customer") and General Electric Company, by and through its division GE OEC Medical Systems ("GE OEC"). This Agreement shall have a 36 month term.

**EFFECTIVE DATE: June 1, 2002**

| **Between** | **And** |
|---|---|
| **GE OEC Medical Systems**<br>**384 Wright Brothers Drive**<br>**Salt Lake City, UT 84116** | **Joint Purchasing Corporation**<br>**1865 Broadway, 11th Floor**<br>**New York, NY 10023** |
| **By:** Richard Peterson | **By:** Edward A. Cienki |
| **Name:** Richard Peterson | **Name:** Edward A. Cienki |
| **Title:** National Accounts Manager | **Title:** Senior Vice President |
| **Date:** June 10, 2002 | **Date:** 3 June 2002 |
| **Telephone Number:** (801) 476-0843<br>(800) 728-6596 | **Telephone Number:** (609) 567-6500 x11<br>**Fax (609) 567-6511** |

EXHIBIT B

**Remittance Advice Details**

| | | | |
|---|---|---|---|
| **Payment Number:** | 0611270511GEMSAM0304 | **Date Prepared:** | Nov-27-2006 |
| **Buying Company:** | GE TradePayables on behalf of GE Medical Systems | | |
| **Settlement Date:** | Nov-29-2006 | **Currency:** | USD |
| **Total Amount:** | 249,291.31 | | |

**Supplier**

| | | | |
|---|---|---|---|
| **Name:** | Joint Purchasing Corp | **Supplier Number:** | 217266102 |
| **Attention:** | | **Bank ID:** | 021000021:0971109103 |

**Buyer**

| | | | |
|---|---|---|---|
| **Origin ID:** | VFSTPS | **Customer Name:** | GE TradePayables on behalf of GE Medical Systems |
| **Payment Location:** | Oracle AP | | |

**Line Items**

| | | | | |
|---|---|---|---|---|
| **Invoice No.** | **Invoice Date:** | Nov-10-2006 | | |
| ERS-410617-1765217 | **Invoice Amount:** | 249,291.31 | **PO No.:** | 305383569 |
| | **Payment Amount:** | 249,291.31 | **PO Release No.** | |
| | **Tax Amount:** | 0.00 | **PO Line No.:** | 1 |
| | **Early Payment Fee:** | 0.00 | **Shipment ID:** | 305383569,3RD QTR 2006 JPC Equipment Sales Commission $249,2 |
| | **Reason Code:** | | **BOL #** | 1171814 |
| | **Comments:** | | | |

Copyright © GXS, Inc. All rights reserved.

**Remittance Advice Details**

| | | | |
|---|---|---|---|
| **Payment Number:** | 070212051OGEMSAM0219 | **Date Prepared:** | Feb-12-2007 |
| **Buying Company:** | GE TradePayables on behalf of GE Medical Systems | | |
| **Settlement Date:** | Feb-14-2007 | **Currency:** | USD |
| **Total Amount:** | 11,286.30 | | |

**Supplier**

| | | | |
|---|---|---|---|
| **Name:** | Joint Purchasing Corp | **Supplier Number:** | 217266102 |
| **Attention:** | | **Bank ID:** | 021000021:0971109103 |

**Buyer**

| | | | |
|---|---|---|---|
| **Origin ID:** | VFSTPS | **Customer Name:** | GE TradePayables on behalf of GE Medical Systems |
| **Payment Location:** | Oracle AP | | |

**Line Items**

| Invoice No. | | | | |
|---|---|---|---|---|
| | **Invoice Date:** | Jan-27-2007 | | |
| ERS-437026-1871861 | **Invoice Amount:** | 11,286.30 | **PO No.:** | 305402896 |
| | **Payment Amount:** | 11,286.30 | **PO Release No.** | |
| | **Tax Amount:** | 0.00 | **PO Line No.:** | 1 |
| | **Early Payment Fee:** | 0.00 | **Shipment ID:** | 305402896,2ND HALF 2006 POS JPC ComprcCare Sales Commission |
| | **Reason Code:** | | **BOL #** | 1303823 |
| | **Comments:** | | | |

Copyright © GXS, Inc. All rights reserved.

**Remittance Advice Details**

| | | | |
|---|---|---|---|
| **Payment Number:** | 0702050513GEMSAM0283 | **Date Prepared:** | Feb-05-2007 |
| **Buying Company:** | GE TradePayables on behalf of GE Medical Systems | | |
| **Settlement Date:** | Feb-07-2007 | **Currency:** | USD |
| **Total Amount:** | 6,726.55 | | |

**Supplier**

| | | | |
|---|---|---|---|
| **Name:** | Joint Purchasing Corp | **Supplier Number:** | 217266102 |
| **Attention:** | | **Bank ID:** | 021000021:0971109103 |

**Buyer**

| | | | |
|---|---|---|---|
| **Origin ID:** | VFSTPS | **Customer Name:** | GE TradePayables on behalf of GE Medical Systems |
| **Payment Location:** | Oracle AP | | |

**Line Items**

| **Invoice No.** | | | | |
|---|---|---|---|---|
| ERS-434298-1862283 | **Invoice Date:** | Jan-19-2007 | | |
| | **Invoice Amount:** | 6,726.55 | **PO No.:** | 305402070 |
| | **Payment Amount:** | 6,726.55 | **PO Release No.** | |
| | **Tax Amount:** | 0.00 | **PO Line No.:** | 1 |
| | **Early Payment Fee:** | 0.00 | **Shipment ID:** | 305402070,4TH QTR 2006 JPC CompreCare Sales Commission $6,72 |
| | **Reason Code:** | | **BOL #** | 1288598 |
| | **Comments:** | | | |

Copyright © GXS, Inc. All rights reserved.

**Invoice Details**

| | | | |
|---|---|---|---|
| **Invoice Number:** | ERS-437026-1871861 | **PO Number:** | 305402896 |
| **Supplier:** | Joint Purchasing Corp | **Buyer:** | GE Healthcare Parent |
| **Invoice Date:** | Jan-27-2007 | **Invoice Status:** | Paid |
| **Payment Amount:** | 11,286.30 | **Payment Date:** | Feb-14-2007 |
| **Comments:** | 305402896,2ND HALF 2006 POS JPC CompreCare Sales Commission $11,286.30:Sales Dir | | |

**Addresses**

| | | | |
|---|---|---|---|
| **Buyer E-mail:** | gems-ap@med.ge.com | **Requestor E-mail:** | gems-ap@med.ge.com |

**Pricing USD**

| | | | |
|---|---|---|---|
| **Item Total Invoiced:** | 11,286.30 | **Item Total Approved:** | 0.00 |
| **Freight Amount Invoiced:** | 0.00 | **Freight Amount Approved:** | 0.00 |
| **Tax Invoiced:** | 0.00 | **Tax Approved:** | 0.00 |
| **Invoice Gross Amount Invoiced:** | 11,286.30 | **Invoice Gross Amount Approved** | 0.00 |

**Shipping Details**

| | | | |
|---|---|---|---|
| **Ship To Postal Code:** | | **Shipment ID:** | 1 |
| **Freight Amount:** | 0.00 | **Shipment Date:** | |
| | | **Shipment Carrier:** | |

**Payment Terms**

| | |
|---|---|
| **Net Due Days:** | 0 |

**Line Items**

| Line No | PO Line No | Part No | Description | UOM | Unit Price | Qty | Invoice Amount | Taxable | Special Charges | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 2ND HALF 2006 POS JPC CompreCare Sales Commission $11,286.30:Sales Direct Services | EA | 11,286.30 | 1 | 11,286.30 | N | 0.00 | |

Copyright © GXS, Inc. All rights reserved.

EXHIBIT C

GE Healthcare

**GROUP PURCHASE AGREEMENT**
**NUCLEAR IMAGING**
**Vector Healthsystems**
**For JPC/CSC**

OBJECTIVE:
Medi-Physics Inc. now doing business as GE Healthcare ("GE Healthcare") had entered into a group purchasing agreement with JPC/CSC ("JPC/CSC") regarding GE Healthcare products for JPC/CSC's Nuclear Imaging contrast media requirements dated effective March 3, 1998 as amended ("Agreement"). On April 23, 2004, JPC/CSC entered into a management agreement whereby the group purchasing contracts and business of JPC/CSC is administrated by Vector Healthsystems. The parties now wish to restate and amend the Agreement as follows:

OFFER, COMMITMENT AND PRICE:
GE Healthcare agrees to offer Nuclear Imaging Products to JPC/CSC's Eligible Member Facilities as defined below at the prices set forth in Exhibit A and in accordance with its standard Delivery Terms and Conditions. Pricing set forth in Exhibit A is intended solely for JPC/CSC's Eligible the Member Facilities. These Member Facilities may not offer these prices, or any value included in this Agreement, to any other facility. GE Healthcare may adjust prices for products listed in Exhibit A subject to a five percent (5%) cap per year in the aggregate. No product will be adjusted more than once every twelve (12) months from the last price increase. Delivery Terms and Conditions may be adjusted within the same time period.

Each Eligible Member Facility is required to purchase at least ninety percent (90%) of its radiopharmaceutical requirements from GE Healthcare. GE Healthcare reserves the right to adjust pricing if the ninety percent (90%) overall compliance is not achieved and maintained.

DELIVERY TERMS AND CONDITIONS

Pharmacy Unit Dose
Product will be delivered to all eligible JPC/CSC members within sixty (60) miles of the authorized network distributor according to the terms described below:
SCHEDULED DELIVERIES: Two (2) deliveries per day, Monday through Friday, during normal work hours of 7:00am – 5:00pm local time will be provided at no charge. A third delivery during normal working hours will be invoiced at $17.00.
ADDITIONAL DELIVERIES: Additional deliveries as requested during normal work hours are considered to be STAT or emergency deliveries and will be invoiced at $93.00 per delivery.
WEEKEND DELIVERIES: One scheduled delivery will be provided on Saturday at a $17.00 charge during normal local pharmacy operating hours. Additional deliveries will be invoiced as STAT or Emergency delivery at $93.00 per delivery. All Sunday, holiday, STAT or emergency orders will be invoiced at $93.00 per delivery.
STAT AND EMERGENCY DELIVERY: Deliveries requested after normal pharmacy hours will be invoiced at $93.00 per delivery.
PHARMACY CALL-OUT FEE: A Pharmacist call-out fee of $162.50 will be assessed for all orders placed on a STAT basis after normal business hours.

ELIGIBILITY
Eligible Member Facility is defined as a JPC/CSC Member now purchasing GE Healthcare Nuclear Imaging Products under the 1998 agreement who has executed a Letter of Commitment (LOC), attached hereto as Exhibit B. Eligible Member Facilities may be added with the mutual consent of both parties, and with thirty (30) days advance notification. GE Healthcare maintains the right not to extend the pricing included in the attached Exhibit A if the new Member has a pre-existing agreement currently in place with GE Healthcare. Eligible Member Facilities added to Agreement will be eligible to receive contract pricing as upon signing a LOC. Any eligible Member deleted from the JPC/CSC membership list will cease to receive contract pricing as of their termination date.

FUTURE CONTRACTING:
GE Healthcare and JPC/CSC agree to explore additional opportunities relating to contracting other lines of business. These opportunities will include enhanced incentives for the Purchaser on current, as well as future, contracted items, along with new business opportunities for GE Healthcare.

PAYMENT TERMS:
Net 30 days for purchases made direct from GE Healthcare

ADMINISTRATIVE FEES:
GE Healthcare agrees to pay Vector, for JPC/CSC, two (2%) percent on Net Sales of GE Healthcare products purchased under this agreement. Net sales shall be calculated as invoice price less all discounts.

TERM:
The Term of this Agreement shall expire on December 31, 2008. The Agreement shall automatically renew every year thereafter unless a party provides six months prior written notice to the other party that it intends to terminate upon the expiration of the current term.

SOCIAL SECURITY ACT COMPLIANCE:
Any incentives offered in this Agreement are considered a "discount or other reduction in price" to the Purchaser under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(a)]. Accordingly, the Purchaser shall disclose this discount or other reduction in price under any state or federal program which provides cost or charged based reimbursement to the Purchaser for the goods and services provided under this contract.

NOTICES:
All notices given or required hereunder shall be deemed sufficient if sent in writing by certified mail, return receipt requested to the addresses of the Seller listed below and the Purchaser as specified below in this Agreement.

GE Healthcare
Amersham plc
101 Camegie Center
Princeton, New Jersey 08540
Attention: Sales Department with copy to the Legal Department

CONFIDENTIALITY:
During the period of this Agreement, the Purchaser agrees that it will treat all information pertaining to this Agreement as confidential and not disclose such information to any third parties without GE Healthcare's prior consent, except as required by applicable law or regulations.

ASSIGNABILITY:
No portion of this Agreement is assignable or transferable, in whole or in part, by Purchaser without the prior written consent of GE Healthcare.

ENTIRE AGREEMENT:
This Agreement, together with all Exhibits constitutes the entire agreement between the parties with respect to the subject matter and shall be binding on them and on their representatives, successors and shall inure to their respective benefits. Any amendments shall be made in writing and be duly executed by an authorized representative of the parties hereto. The parties agree that this Agreement supersedes and replaces all prior writings, discussions and rights relating to the subject matter hereof.

TO: PURCHASER

(signature)

Robert Baglini

Director Diagnostic Services

Vector Healthsystems
For JPC/CSC

10 Charles Street

Providence, RI 02904

Date Signed: 12/8/04

FROM: GE HEALTHCARE

Michael J. Ragusa

National Account Executive

GE Healthcare

101 Carnegie Center

Princeton, NJ 08540

Date Signed: 12/05/04

Effective 1/1/05
Contract # 2469

GE Healthcare

**GROUP PURCHASE AGREEMENT**
**CONTRAST MEDIA**
**Vector Healthsystems**
**For JPC/CSC**

**OBJECTIVE:**
Amersham Health Inc. now doing business as GE Healthcare ("GE Healthcare") had entered into a group purchasing agreement with JPC/CSC ("JPC/CSC") regarding GE Healthcare products for JPC/CSC's contrast media requirements dated effective August 2, 1999 as amended ("Agreement"). On April 23, 2004, JPC/CSC entered into a management agreement whereby the group purchasing contracts and business of JPC/CSC is administrated by Vector Healthsystems. The parties now wish to restate and amend the Agreement as follows:

**OFFER, COMMITMENT AND PRICE:**
GE Healthcare agrees to offer OMNIPAQUE®, VISIPAQUE®, OMNISCAN®, HYPAQUE® and OPTISON® to JPC/CSC's Eligible Member Facilities as defined below at the prices set forth in Exhibit A. Pricing set forth in Exhibit A is intended solely for JPC/CSC's Eligible the Member Facilities. These Member Facilities may not offer these prices, or any value included in this Agreement, to any other facility. GE Healthcare may adjust prices for products listed in Exhibit A, subject to a five percent (5%) cap per year in the aggregate. No product will be adjusted more than once every twelve (12) months from the last price increase.

Each Eligible Member Facility is required to achieve ninety percent (90%) LOCM, MRI and Ultrasound compliance. Exhibit A includes a tier for Eligible Member Facilities that purchase less than 90% but greater than 80% of their LOCM, MRI and Ultrasound compliance requirements. GE Healthcare reserves the right to adjust pricing if the ninety percent (90%) overall compliance for the three modalities in the aggregate is not achieved and maintained.

LOCM compliance is defined as total purchases of Omnipaque, Visipaque and any new GE Healthcare product in this class introduced in the market divided by total purchases of Omnipaque, Visipaque, Isovue®, Optiray®, Hexabrix®, Ultravist®, Oxilan® and similar products in this class, including new products and generic equivalents that are introduced into the market place after the Effective Date of this Agreement.

MRI compliance is defined as total purchases of Omniscan and any new GE Healthcare product in this class introduced in the market divided by total purchases of Omniscan, Magnevist®, Prohance®, Optimark®, Feridex® and similar products in this class, including new products and generic equivalents that are introduced into the market place after the Effective Date of this Agreement.

Ultrasound compliance is defined as total purchases of Optison and any new GE Healthcare product in this class introduced in the market divided by the total purchases of Optison, Definity® and similar products in this class, including new products and generic equivalents that are introduced into the market after the Effective Date of this Agreement.

**ELIGIBILITY**
Eligible Member Facility is defined as a JPC/CSC Member now purchasing GE Healthcare contrast media products under the 1999 agreement who has executed a Letter of Commitment (LOC), attached hereto in Exhibit A. Eligible Member Facilities may be added with the mutual consent of both parties, and with thirty (30) days advance notification. GE Healthcare maintains the right not to extend the pricing included in the attached

Exhibit A if the new Member has a pre-existing agreement currently in place with GE Healthcare. Eligible Member Facilities added to Agreement will be eligible to receive contract pricing as upon signing a LOC. Any eligible Member deleted from the JPC/CSC membership list will cease to receive contract pricing as of their termination date.

**FUTURE CONTRACTING:**
GE Healthcare and JPC/CSC agree to explore additional opportunities relating to contracting other lines of business. These opportunities will include enhanced incentives for the Purchaser on current, as well as future, contracted items, along with new business opportunities for GE Healthcare.

**PAYMENT TERMS:**
2% 30 days, net 31 days for purchases made direct from GE Healthcare

**ADMINISTRATIVE FEES:**
GE Healthcare agrees to pay Vector, for JPC/CSC, administrative fees on Net Sales of GE Healthcare products purchased under this agreement as per the following schedules. Net sales shall be calculated as invoice price less all discounts. Visipaque sales will be used in the calculation of LOCM market share as described in the OFFER, COMMITMENT and PRICE Section; administrative fees payable on net Visipaque sales shall remain at 2%.

| LOCM: | | MR: | |
|---|---|---|---|
| JPC/CSC Compliance | Administrative Fee | JPC/CSC Compliance | Administrative Fee |
| 0%-64.9% | 2% | 0%-6.9% | 2% |
| 65% - Above | 3% | 65% - Above | 3% |

**MINIMUM ORDERS:**
The minimum order to qualify for direct shipments of X-Ray/MR products is $500.00 at Eligible Member contract price. Orders below $500.00 will still be shipped prepaid, but a shipping charge of $17.50 will be added to the invoice. All products within the GE Healthcare X-Ray/MR line may be used to make up a minimum order. Orders below $500.00 at hospital contract price should be placed through a preferred Wholesaler/Distributor.

Optison orders received by 3:00pm CST are shipped direct, same day, with no charge; orders received after 3:00pm CST shipped next day. As Optison is a refrigerated product and is shipped FedEx overnight, GEHC does not ship Optison on Fridays except by special arrangement.

**TERM:**
The Term of this Agreement shall expire on December 31, 2008. The Agreement shall automatically renew every year thereafter unless a party provides six months prior written notice to the other party that it intends to terminate upon the expiration of the current term.

**SHIPPING TERMS:**
All deliveries shall be C.I.F. instead of "FOB Destination." The consequence of this change is that JPC/CSC members agree to take title of product and risk of ownership upon Shipment from GE Docks. GE will pay the freight and is responsible for covering the risk of property damage or loss to the product ordered until delivery to designated delivery point. Customer has the same rights to post-delivery inspection and remedies in the event of improper delivery as under the F.O.B. term. GE will file any and all claims for damages with the carrier and shall promptly replace all damaged product regardless of the status of claims against the carrier

**SOCIAL SECURITY ACT COMPLIANCE:**
Any incentives offered in this Agreement are considered a "discount or other reduction in price" to the Purchaser under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(a)]. Accordingly, the Purchaser shall disclose this 'discount or other reduction in price under any state or federal program which provides cost or charged based reimbursement to the Purchaser for the goods and services provided under this contract.

**NOTICES:**
All notices given or required hereunder shall be deemed sufficient if sent in writing by certified mail, return receipt requested to the addresses of the Seller listed below and the Purchaser as specified below in this Agreement.

GE Healthcare
Amersham plc
101 Carnegie Center
Princeton, New Jersey 08540
Attention: Sales Department with copy to the Legal Department

**CONFIDENTIALITY:**
During the period of this Agreement, the Purchaser agrees that it will treat all information pertaining to this Agreement as confidential and not disclose such information to any third parties without GE Healthcare's prior consent, except as required by applicable law or regulations.

**ASSIGNABILITY:**
No portion of this Agreement is assignable or transferable, in whole or in part, by Purchaser without the prior written consent of GE Healthcare.

**ENTIRE AGREEMENT:**
This Agreement, together with all Exhibits constitutes the entire agreement between the parties with respect to the subject matter and shall be binding on them and on their representatives, successors and shall inure to their respective benefits. Any amendments shall be made in writing and be duly executed by an authorized representative of the parties hereto. The parties agree that this Agreement supersedes and replaces all prior writings, discussions and rights relating to the subject matter hereof.

TO: PURCHASER

(signature)

Robert Baglini
Director, Diagnostic Services
Vector Healthsystems
For JPC/CSC
10 Charles Street
Providence, RI 02904
Director, Diagnostic Services

Date Signed: 12/8/04

FROM: GE HEALTHCARE

Michael J. Ragusa
National Account Executive
GE Healthcare
101 Carnegie Center
Princeton, NJ 08540

Date Signed: 12/8/04